## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

BETHANY A. H.,[1]

                  Plaintiff,

v.                                             ACTION NO. 2:23cv145

SOCIAL SECURITY ADMINISTRATION,

                  Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Plaintiff seeks judicial review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her application for disability benefits under Title II of the Social Security Act.  Plaintiff brings this case pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  An order of reference assigned this matter to the undersigned.  ECF No. 10.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, the undersigned recommends that plaintiff's appeal of the Commissioner's final decision and request for a remand (ECF No. 13) be **DENIED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.    PROCEDURAL BACKGROUND

Bethany H. ("plaintiff") applied for benefits in March 2019, alleging a disability starting on October 18, 2016, due to various physical and mental impairments.[2] R. 12, 16, 89, 201. After the state agency denied the claim both initially and on reconsideration, R. 12, plaintiff sought review before Administrative Law Judge ("ALJ") O. Price Dodson, who denied the claim on March 25, 2021, R. 12, 116–25. The Appeals Council, however, vacated ALJ Dodson's decision and remanded the case. R. 12, 130–31.

On remand and after obtaining other treatment records, ALJ Carol Matula held a telephonic hearing on April 6, 2022. R. 13, 37, 39. Three months later, ALJ Matula issued a decision denying benefits. R. 12–30. On February 14, 2023, the Appeals Council denied plaintiff's request to review the ALJ's decision. R. 1–5. Accordingly, that decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff, acting in a pro se capacity, filed a complaint on April 18, 2023.[3] ECF No. 3. The Commissioner filed a certified copy of the administrative record on July 3, 2023. ECF No. 9. In response to the Court's orders, plaintiff filed a two-page, letter brief on August 23, 2023, ECF No. 13, and the Commissioner filed a brief seeking to uphold the ALJ's decision on September 21, 2023, ECF No. 15. No reply brief has been filed. As oral argument is unnecessary, the case is fully submitted for decision.

---

[2] Page citations are to the administrative record filed with the Court.

[3] Plaintiff sought leave to proceed *in forma pauperis* on April 7, 2023. ECF No. 1. The Court granted her motion and directed that the complaint be filed on April 18, 2023. ECF No. 2.

## II.   <u>RELEVANT FACTUAL BACKGROUND</u>

Plaintiff argues that the ALJ's denial of her disability claim is not supported by substantial evidence. ECF No. 3, at 3. Plaintiff argues that she cannot work due to physical and mental health problems and is disabled. *Id.*; ECF No. 13, at 1. The facts germane to this argument are discussed below.

### A.   *Hearing Testimony by Plaintiff and Other Information*

When testifying before ALJ Matula on April 6, 2022, plaintiff was 39 years old and lived in Norfolk with her husband.[4]  R. 39, 43, 71–72. Plaintiff, a high school graduate, worked as an insulator at the Huntington Ingalls shipyard from 2006 through October 2016, and before that worked in a warehouse for the Virginian-Pilot newspaper for two years. R. 44–45, 73, 229. After injuring her right knee at the shipyard in 2011, plaintiff received worker's compensation and worked in a light duty capacity. R. 46–47, 74, 235. Her shipyard employment ended, however, when light duty work was no longer available and plaintiff's medical restrictions on lifting weights, climbing stairs and ladders, and crawling precluded resuming work as an insulator. R. 45–47, 74.

Following the knee injury, plaintiff underwent surgery to clean out the chipped bone, received cortisone and other injections, and did physical therapy for about a year. R. 50, 74, 235; *see* R. 51 (noting she no longer performs home exercises). According to plaintiff, her orthopedist advised that she had run out of treatment options (aside from weight loss), and will eventually need a knee replacement. R. 50, 77. Before ALJ Dodson, plaintiff identified her right knee as her "biggest problem," along with swelling and pain caused by standing or sitting too long, and also described the knee as "catch[ing]" and "giv[ing] out on [her]" while walking. R. 77. Plaintiff

---

[4] Plaintiff also testified on February 24, 2021 before ALJ Dodson. R. 66, 71–82. The Court has reviewed both hearing transcripts and cites to both, as needed.

takes Tylenol multiple times a day to manage the pain. R. 51–52, 77; *see* R. 52 (noting that she discontinued pain management and use of Percocet due to side effects, including depression).

Plaintiff also suffers from a constant, dull, mid-back pain, which makes it difficult to bend at the waist, stand or walk for long, and take showers. R. 52, 77–78. Plaintiff's back and knee pain wakes her up night, causing her to take more Tylenol. R. 53, 75. Doctors have recommended weight loss to mitigate back pain. R. 78.

Plaintiff also experiences anxiety and depression. R. 48. Her anxiety "comes in waves" at unpredictable intervals each day, including while watching TV or lying in bed. R. 48–49. Although she is licensed and continues to drive once or twice a week, plaintiff goes out infrequently due to anxiety and panic attacks, which leave her short of breath, crying, and feeling as if "everything's closing in around [her]." R. 43–44, 72, 81. These attacks tend to last 10 to 15 minutes and are triggered by social situations, stress, and encounters with the public. R. 81. Plaintiff's primary care provider has prescribed Lexapro for depression and Buspar and clonazepam for anxiety.[5] R. 47. Although testifying that things were "really, really bad for a while," plaintiff has not sought psychological or psychiatric treatment or counselling because, with medication, her conditions are "more manageable." R. 47, 80; *see* R. 48 (noting reluctance to having to "go through everything" with a new doctor). Plaintiff also manages panic attacks with breathing exercises and self-reassurance until her symptoms subside. R. 48.

Once or twice a week, plaintiff experiences bouts of depression, which runs in her family. R. 48–49. These episodes sap plaintiff's desire to leave the house and to get anything done. *Id.* Plaintiff tries to manage them by "not . . . think[ing] about things too much and [by] just do[ing]

---

[5] Plaintiff also takes verapamil and lisinopril for blood pressure, Lasix for swelling in her legs, Protonix for acid reflux, and Synthroid because of the prior removal of her thyroid gland. R. 47.

them." *Id.*

Plaintiff advises that her impairments limit daily activities.  She seldom ventures outside the house, and typically does so only to go to the grocery store, doctors' appointments, the bank, and her parents' house.  R. 44, 51, 54, 75–76, 80–81.  After grocery shopping, plaintiff carries in items that are light or need refrigeration, but leaves heavier items in the trunk for her husband to get later.  R. 55.  Aside from spending time with family, plaintiff only infrequently socializes with one good friend and does not participate in clubs or other social activities.  R. 49, 76.  Plaintiff enjoys hobbies such as journaling, painting rocks, reading, taking pictures, watching TV shows, and playing games on her phone.  R. 53, 76.  Aside from tending to flowerpots, plaintiff leaves the yard work to her husband.  R. 54, 76.

Plaintiff and her spouse share household cleaning duties, including the laundry.  R. 55.  They both put dirty items directly into the washer and her spouse moves the washed and wet clothes into the dryer, removes them when dry, and gives them to plaintiff for folding.  R. 51, 55, 75.  This minimizes the need for plaintiff to bend and lean over.  R. 55.  Although she does little to no cooking, other than fixing simple items like sandwiches, plaintiff does the dishes.  R. 49–51, 75.  Her spouse does the vacuuming and cleans the bathroom tub, while plaintiff takes care of other bathroom cleaning.  R. 51.  Plaintiff avoids activities that involve painful bending, standing, and other movements.  *See* R. 52.

On a typical day plaintiff gets up around 7:00 or 8:00 a.m., feeds and lets the dogs out, naps once or twice a day, watches TV, surfs the Internet and social media, eats dinner with her husband, and retires around 9:00 p.m.  R. 51, 53–54, 75–76.  Although pain associated with bending and moving reduces the frequency of her showering, plaintiff remains able to dress and engage in self-care tasks.  R. 52–53, 75–76.  Due to lymphedema and venous reflux and associated swelling in

her legs, plaintiff regularly wears compression socks, takes a fluid pill, avoids prolonged sitting or standing, and tries to elevate her legs every two to three hours. R. 78–79.

In an April 14, 2019 disability report, plaintiff identified the conditions limiting her ability to work as: back pain due to degenerative changes in the thoracic-lumbar junction; arthritis in her knees, along with an injury to the right knee; hypertension; lymphedema; venous insufficiency; and super morbid obesity. R. 228; *see* R. 272 (reporting new conditions of depression and anxiety starting in Winter 2019).

In an April 24, 2020 function report, plaintiff supplied information like that noted above.[6] R. 263–70. In it, plaintiff reports caring for her dogs, but that her husband walks, bathes, and picks them up. R. 264. She finds that back and knee pain substantially limit activities, such as working, walking, standing, sleeping, dressing, showering, cooking, and shaving. R. 263–65. Plaintiff, however, accompanies the dogs outside to the backyard about six times per day. R. 255, 266. Plaintiff also continues to drive and goes out on her own, and manages her own medications and finances. R. 265–66. Before the onset of her conditions, including anxiety and depression, plaintiff worked full-time, as well as overtime, and enjoyed outings like dining, sporting events, and listening to music. R. 268; *see* R. 257 (listing other activities that plaintiff mostly can no longer engage in due to her conditions). Post-onset, plaintiff reports that it now hurts to do everything and that this limits activities like lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks. R. 268. For example, plaintiff can only walk about one-quarter of a block without stopping to rest for five minutes and now rarely dresses up due to depression and anxiety. R. 264, 268.

---

[6] Plaintiff also completed an earlier function report on May 20, 2019. R. 252–59. Although not identical, the information supplied in the two reports is mostly consistent.

6

Plaintiff classifies her ability to pay attention for any length of time and to follow spoken instructions as "average." R. 268. She reports being unable to finish what she starts. *Id.* She describes her ability to follow written instructions as "average [to] below average." *Id.* She also reports having no problems getting along with authority figures, but wrestles with dealing with stress or changes in routine. R. 269.

## B.    *Hearing Testimony by Vocational Expert*

George Starosta, a vocational expert ("VE"), also testified before ALJ Matula. R. 38, 57–63. After classifying plaintiff's past relevant work as an insulator and a warehouse worker as medium duty work, VE Starosta agreed that plaintiff could not return to those occupations. R. 58. Assuming a claimant of plaintiff's age and experience and subject to the limitations in the ALJ's hypothetical,[7] VE Starosta interpreted the standing and walking limitation as slightly less than typical for a light work job. R. 59. He treated this limitation as calling for a sit/stand option, providing for alternating between sitting and standing. *Id.* Based on that interpretation, VE Starosta opined that such a hypothetical person could work as a cashier, ticket taker, and folder, as many such jobs were available in the national economy. R. 59–60.

The ALJ's second hypothetical kept the same postural limitations, but restricted the claimant to only sedentary work. R. 60. VE Starosta opined that the hypothetical claimant could work in the national economy as a telemarketer, mail sort clerk, and surveillance system monitor. R. 60–61. If limited to simple, routine, and repetitive work, at a non-production pace where other workers' production would not depend on the hypothetical claimant's work, VE Starosta opined

---

[7] The ALJ's first hypothetical assumed a person of plaintiff's age and experience who:  (1) could work at the light exertion level; (2) could only stand and walk four hours; and (3) could only occasionally perform all postural movements, except that she could frequently balance. R. 59.

that, under the Dictionary of Occupational Titles ("DOT")[8], all but the telemarketing job would remain available. R. 61. VE Starosta also opined, based on his experience, that the DOT's earlier classification of telemarketing as semi-skilled work no longer applied to that job as now performed and it fell within the scope of simple and routine work posited by the ALJ. *Id.* VE Starosta stated that the jobs of cashier, ticket taker, and telemarketer, and 45% of surveillance system monitor jobs, would be excluded if the claimant had a limitation for frequent public contact. R. 61–62. Finally, VE Starosta clarified that his testimony about a sit/stand option, non-production pace, interaction with the public, time off task, and absenteeism, although not inconsistent with the DOT, was based upon his knowledge and experience. R. 63.

## C.   *Relevant Medical Record*

### 1.   *Treatment at Independence Family Medicine*

Plaintiff treated at Independence Family Medicine with Family Nurse Practitioner ("FNP") Mary Huntley-Wagner about seven times from 2019 through 2021. R. 544–612, 736–86, 805–49. On March 29, 2019, plaintiff sought treatment for several conditions, including leg swelling, gastro-esophageal reflux disease ("GERD"), thyroid disease, and hypertension. R. 592–93. During a review of systems, plaintiff reported losing weight (down to 330 lbs.) and complained of back pain and a rash. R. 595. FNP Huntley-Wagner's physical exam yielded normal findings, except for a rash, lower extremity swelling, and a blood pressure reading of 190/150. R. 595–96. The neurologic and psychiatric part of that exam revealed a normal memory, full orientation to

---

[8] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. *U.S. Dep't of Labor, Dictionary of Occupational Titles* (4th ed. 1991); *U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

plaintiff's surroundings, and an appropriate mood and affect. R. 596. FNP Huntley-Wagner told plaintiff to resume taking furosemide to treat swelling (and hypertension), prescribed lisinopril for worsening hypertension, continue with her endocrinologist for thyroid issues, and encouraged exercise.[9] R. 592.

On September 17, 2019, plaintiff returned complaining of anxiety, panic attacks, and hypertension. R. 568–69. Although she started having intermittent anxiety in mid-Summer 2019, as time passed, these progressed to full-blown panic attacks, along with tachycardia, anxiety, and dyspnea. *Id.* Plaintiff's systems review was unremarkable, except for anxiety and insomnia. R. 570. A physical exam found her fully oriented, but distressed, anxious, tearful, and with tachycardia. R. 571; *see* R. 570 (noting a blood pressure reading of 150/120). FNP Huntley-Wagner assessed hypertension, hypothyroidism, panic, a high body mass index, and prescribed clonazepam and escitalopram for anxiety. R. 568.

During an October 1, 2019 follow-up, plaintiff reported some relief with medication. R. 562. She linked her anxiety to living with chronic back pain and associated problems with daily functioning. *Id.* Her symptoms included "anxious/fearful thoughts, difficulty concentrating, excessive worry, fatigue and racing thoughts," but without depression, sleep problems, hallucinations, suicidal thoughts, paranoia, or bouts of manic energy. *Id.* A systems review listed the above-noted symptoms, as well as fatigue, back pain, weight gain, and tachycardia. R. 565; *see id.* (noting blood pressure reading of 140/100). A physical exam found, among other things, moderate thoracic and lumbar spinal pain with movement, a normal gait, normal memory, insight, and judgment, and described plaintiff as anxious, fully oriented, with an appropriate mood and

---

[9] Treatment notes reflect that plaintiff's GERD symptoms were relieved by taking proton pump inhibitors. R. 593.

affect. R. 566.

Treatment notes described her back troubles as dating back six years and as being stable, persistent, and without radiating pain. R. 563 (noting that physical therapy and pain management provided little to no relief). FNP Huntley-Wagner reviewed with plaintiff spinal MRI results from September 2019, notable for the absence of abnormal findings.[10] *Id.*

FNP Huntley-Wagner assessed plaintiff with: (1) chronic, midline, low back pain without sciatica and referred her to physical therapy and for an orthopedic consult; (2) hypothyroidism and continued her on medication; (3) depression, unspecified, and increased the dosage of escitalopram; and (4) hypertension and increased the dosage of verapamil. R. 562.

FNP Huntley-Wagner next saw plaintiff on December 13, 2019 for anxiety, palpitations, and a PAP test. R. 549–50. Plaintiff reported "feeling less anxious" on medication, but complained of recent palpitations without chest pain. *Id.* Despite plaintiff's reports of an irregular heartbeat and palpitations, the cardiovascular portion of the physical exam and an EKG revealed normal findings. R. 552–53.

After an apparent absence of over a year, plaintiff next returned for treatment on January 13, 2021.[11] R. 754. Plaintiff presented with worsening, dull pain and tenderness in the mid-back and right flank, aggravated by daily activities and changes in position. R. 755; *see* R. 757 (noting also reports of anxiety, depression, and palpitations during systems review); *see also id.* (noting blood pressure reading of 124/82). A physical exam yielded normal results, except for: (1)

---

[10] The lumbar spine MRI study took place on September 25, 2019. R. 611–12. It revealed a normal alignment, no degenerative disc disease, no marrow abnormalities, no compression fractures, no annular fissures, and "no evidence of a disc herniation, central stenosis, lateral recess compromise, or nerve root impingement." *Id.*

[11] Despite the absence of records of office visits, plaintiff received prescription refills on March 19, September 16, and December 17, 2020. *See, e.g.*, R. 738.

anxiety; (2) mild thoracic spinal pain with movement; and (3) poor posture, minimal paraspinal muscle tenderness without spasm, and the absence of spinal point tenderness. R. 757. FNP Huntley-Wagner assessed, among other things, dorsalgia and recommended both physical therapy and use of over-the-counter ("OTC") pain relievers. R. 754.

FNP Huntley-Wagner gave plaintiff a preventive medical exam on June 7, 2021. R. 747. Plaintiff reported improving depression symptoms and said that "functioning [w]as not difficult at all." R. 748. FNP Huntley-Wagner described plaintiff's mood, anxiety, and symptoms of depression to be "well controlled" with medication, and noted the "only concern" was a loss of libido as a side effect of medication. *Id.* (noting prescriptions for escitalopram, clonazepam, and buspirone). Plaintiff's hypertension was also stable. *Id.* A systems review was positive for weight loss (285 lbs.) and decreased libido, and a physical exam yielded normal findings. R. 751–52. FNP Huntley-Wagner prescribed Bupropion to reduce unwanted side effects and counseled plaintiff about diet and exercise. R. 747.

Plaintiff next treated at Independence Family Medicine on December 9, 2021. R. 741. Her systems review was positive for weight loss, pain in the abdomen and right flank, and excess worry. R. 742 (describing sharp abdominal pain, aggravated by bending, starting several weeks earlier), 744. FNP Huntley-Wagner's physical exam found abdominal and costovertebral angle tenderness, but noted otherwise normal medical and psychiatric findings. R. 745. She ordered lab tests, an ultrasound, prescribed an increased dose of buspirone, and told plaintiff to continue with high blood pressure medication and with her endocrinologist. R. 741–42. An abdominal ultrasound on December 10, 2021 revealed gallstones (cholelithiasis, non-acute) and a suspect supraumbilical ventral hernia (subject to confirmation by CT exam), but was otherwise normal. R. 842–43.

11

## 2.   *Treatment at Sentara Health*

### a.   *Treatment for Hypothyroidism*

As noted by the ALJ, plaintiff has a history of thyroid cancer, which led to removal of her thyroid around 2008, with post-surgical hypothyroidism.  R. 16, 630, 632, 793.  Afterward, plaintiff received treatment at NDC-Endocrinology with Ghandi Saadeh, M.D., to assess and treat her hormone levels with medication.  *See, e.g.*, R. 632–33.  For example, Dr. Saadeh saw plaintiff on September 12, 2016, when she complained of chronic fatigue and hair loss.  *Id.*  A systems review was normal, aside from noting slight weight loss, malaise, and fatigue.  R. 633.  A physical exam also yielded normal results, but noted plaintiff's tearfulness in talking about hair loss.  R. 633–34.  Dr. Saadeh found no evidence of thyroid cancer, described plaintiff's hormone levels as somewhat elevated but attributed that to possible medication non-compliance, and told plaintiff to get a pill box, work on compliance, and re-test in two months.  R. 632.

Plaintiff next saw Dr. Saadeh and had lab work done on September 22, 2017.  R. 629–31.  At this visit, Dr. Saadeh changed plaintiff's dosage of Synthroid to lower her hormone levels and directed her to follow up in one year.  R. 630.  A systems review described plaintiff's malaise and fatigue as "not too bad," and was also positive for constipation, joint pain, memory loss, and brain fog.  R. 631 (noting also plaintiff takes Ambien for insomnia).  A physical exam yielded normal results.  *Id.*

Plaintiff's next annual check-up with Dr. Saadeh was on December 28, 2018.  R. 627.  He again counseled plaintiff on medication compliance, continued her on Synthroid, and ordered more lab tests.  *Id.*  A systems review noted weight gain and was positive for malaise, fatigue, and back pain.  R. 628.  The results of Dr. Saadeh's physical exam were unremarkable.  *Id.*

Dr. Saadeh followed the same treatment plan during plaintiff's next visit on June 25, 2020. R. 616 (noting slightly below normal hormone levels, but no evidence of thyroid cancer). Plaintiff reported some fatigue, but also noted that her depression had improved after starting medication. R. 617. Treatment notes reflected this, as well as plaintiff's weight loss, but were otherwise unremarkable. *Id.*

At an annual check-up on July 8, 2021, Dr. Saadeh adjusted plaintiff's Synthroid dosage based upon abnormal hormone levels. R. 792. Treatment notes describe plaintiff as feeling "relatively well" and better on her antidepressant, and noted her successful efforts to lose weight. R. 793. Plaintiff's physical exam yielded normal findings and a systems review was negative, including for fatigue and anxiety. *Id.*

### b. *Other Treatment*

On April 1, 2019, the emergency department at Sentara Leigh Hospital treated plaintiff for chest pain and a severe headache lasting several days. R. 619, 621. A review of systems was positive for chest pain, light headedness, and headaches, but was otherwise negative, including for palpitations and leg swelling. R. 621. A physical exam revealed plaintiff to be distressed, but with otherwise normal results, including for muscular range of motion and for orientation to her surroundings. *Id.* Following normal chest x-rays, an EKG, lab tests, and after her headache improved on a "migraine cocktail," plaintiff was discharged. R. 620, 625–26, 662–63.

### 3. *Treatment at Primecare Internal Medicine*

Primecare Internal Medicine provided monthly pain management care to plaintiff from about January 2018 through May 2019. R. 448–84 (listing 13 visits in 2018 and 5 visits in 2019). Plaintiff's treatment providers were Garfield Samuels, M.D., and nurse practitioners working at the clinic. *See, e.g.*, 448, 481, 483.

The treatment notes for these visits are very similar. Plaintiff sought prescription pain relief for back and knee pain, as OTC medications were inadequate. *See, e.g.*, R. 448. Her pain level typically ranged from 4 out of 10 to 6–8 out of 10. *See, e.g.*, R. 454, 473. The diagnoses rendered were mostly "other internal derangement of knee," chronic pain syndrome, and backache, as well as occasionally muscle spasm, joint pain, nausea, hypothyroidism, and obesity. R. 449, 451, 453, 455, 469, 472. The clinic typically prescribed monthly refills of acetaminophen-oxycodone (Percocet 5 mg./Acetaminophen 325 mg.), along with occasional prescriptions for other drugs for nausea and muscle relaxation. *See, e.g.*, R. 478, 480, 482.

### 4.    *Treatment with the Center for Vein Restoration*

Upon referral from FNP Huntley-Wagner, plaintiff also received treatment from Keith Nichols, M.D., of the Center for Vein Restoration. R. 518. On December 4, 2018, Dr. Nichols initially evaluated bilateral pain, swelling, and skin changes in plaintiff's calves, ankles, and feet. *Id.* Plaintiff characterized her "concerns [as] moderate," and described symptoms including pressure and sharp pain (level 7–8 out of 10), which were aggravated by strenuous activity and prolonged sitting, standing, or walking. *Id.* Dr. Nichols' exam findings included lipodermatosclerosis in plaintiff's calves and non-pitting edema in her calves, ankles, and feet. R. 519. An ultrasound revealed venous insufficiency and lymphedema. R. 520. Dr. Nichols recommended surgical intervention, but advised that insurance required first using a medical grade compression sock for six weeks. R. 520–21. His diagnoses were: pain in both lower legs; chronic venous hypertension with bilateral lower extremity complications; lymphedema; pigmentation disorder; obesity; and hypertension. R. 520.

When conservative treatment failed, R. 492, 494, plaintiff underwent ablation of the refluxing veins on February 5, 12, 19, 26, and March 5, 2019, to improve blood flow and reduce

swelling and discomfort, R. 495–504. During a follow-up exam on May 21, 2019, plaintiff's pain had fully resolved and her swelling had improved significantly. R. 522. Dr. Nichols' exam also found plaintiff's extremities to be neurovascularly intact and noted marked improvement in rashes and swelling on her calves, but found hyperpigmentation on the ankles. R. 523. An ultrasound revealed that plaintiff was negative for venous insufficiency and for deep vein thrombosis in the lower extremities. R. 524. Dr. Nichols directed regular use of compression stockings and to return in six months. *Id.*

### 5.    *Treatment with Atlantic Orthopaedic Specialists*

On September 4, 2018 plaintiff treated with Sheldon L. Cohn, M.D., an orthopedist. R. 321 (noting Dr. Cohn last treated plaintiff one year earlier). Although complaining of "retropatellar pain of her right knee," plaintiff sought no treatment and only sought completion of certain "paperwork," presumably related to her status at work. R. 321–22. Dr. Cohn noted with some uncertainty that x-rays of the right knee showed "a bit more medial joint space narrowing," but described plaintiff's condition as "essentially unchanged." R. 321. He diagnosed localized osteoarthritis of the right knee and chondromalacia of the right patella. R. 322.

### 6.    *State Agency Physician Reviews*

On June 20, 2019, Eugene Noland, M.D., a state agency physician opined plaintiff: (a) could lift and/or carry 20 pounds occasionally and 10 pounds frequently; (b) could stand and/or walk for 4 hours each, and sit for about 6 hours in a normal workday; (c) could push and/or pull without limits, other than as limited in lifting and/or carrying; (d) could balance, climb ramps and stairs, and stoop without limitation; (e) could only occasionally kneel, crouch, crawl, and climb ladders, ropes, and scaffolds; and (f) had no manipulative, visual, communicative, or environmental limitations. R. 94–95 (attributing limitations to obesity and osteoarthritis in the

right knee).

On reconsideration on June 17, 2020, state agency physician Michael Koch, M.D., reached the same conclusions as Dr. Noland.  R. 107–08.

On reconsideration, state agency psychologist Howard S. Leizer, Ph.D., assessed plaintiff's anxiety and classified the condition as non-severe and failing to meet or medically equal the listing for anxiety and obsessive-compulsive disorders.  R. 104–06.  As to the paragraph B criteria of the listing, Dr. Leizer opined that plaintiff had no limitations in understanding, remembering, or applying information, in interacting with others, and in adapting and managing herself.  R. 105. Dr. Leizer opined that plaintiff was mildly limited in concentrating, persisting, and maintaining pace.  *Id.*  He explained that, despite recent reports of anxiety, plaintiff responded well to medication, her symptoms had improved, and mental status examinations yielded normal results. *Id.*

### III.   THE ALJ's DECISION

Pro se pleadings must be construed liberally, *Jackson v. Lightsey*, 775 F.3d 170, 177 (4th Cir. 2014), and are held to a less stringent standard than those drafted by attorneys, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Despite this, a court's "task is not to discern the unexpressed intent of the plaintiff, but what the words in the complaint mean."  *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006); *see also Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) ("The special judicial solicitude with which a district court should view [] pro se complaints does not transform the court into an advocate.") (internal quotation marks omitted); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985) (district courts cannot "be required to conjure up and decide issues never fairly presented to them").

In her form complaint, plaintiff checked the box indicating that the Commissioner's factual findings are unsupported by substantial evidence. ECF No. 3, at 3. Although the complaint identifies no specific, erroneous findings made by the ALJ, plaintiff states that ongoing physical and mental health issues preclude gainful employment and she cannot support herself. *Id.* Plaintiff's letter briefly expounds upon this theme, noting that she previously took pride in performing "physical jobs," including at the Newport News Shipyard, requiring extensive physical activities, including standing, walking, moving heavy items, climbing stairs and ladders, and crawling on staging. ECF No. 13, at 1. Now, however, plaintiff finds herself unable to work and struggling to get out of bed every day, due to pain and associated depression, anxiety, and panic attacks. *Id.* Plaintiff reports having "lost [her] freedom and independence" and is so limited that her own abilities and activities of daily living are surpassed by those of her septuagenarian parents. *Id.*

The Commissioner argues that the ALJ's decision is supported by substantial evidence. Def.'s Br. in Supp. of Comm'r.'s Decision Denying Benefits and in Opp. To Pl.'s Mot. for Summ. J., ECF No. 15, at 11–15.

Against this backdrop, the Court reviews the ALJ's decision to ensure that it applies the "correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (internal quotations and citation omitted). To evaluate plaintiff's claim of disability,[12] the ALJ followed the five-step analysis set forth in the

---

[12] To qualify for benefits, a claimant must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, a claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national

SSA's regulations. *See* 20 C.F.R. § 404.1520(a). The ALJ considered whether plaintiff: (a) was engaged in substantial gainful activity; (b) had a severe impairment; (c) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (d) had an impairment that prevents her from performing any past relevant work given her residual functional capacity ("RFC"); and (e) was able to perform other work considering her RFC, age, education, and work experience. R. 14–30.

The ALJ found that plaintiff met the insured requirements[13] of the Social Security Act through June 30, 2021, and had not engaged in substantial gainful activity from October 18, 2016, her alleged onset date of disability. R. 16.

At steps two and three, the ALJ found that plaintiff had two severe impairments: (a) obesity (with a body mass index ("BMI") in the 50's and 60's); and (b) osteoarthritis in the right knee. *Id.* The ALJ classified plaintiff's remaining medically-determinable impairments, including GERD, hypertension, cholelithiasis, possible ventral hernia, history of thyroid cancer, hypothyroidism, tension headaches, lower extremity edema, hyperpigmentation of the ankles, anxiety, and depression, as non-severe. R. 16–17. The ALJ did, however, factor these impairments into limitations incorporated into her findings on plaintiff's RFC. R. 19. The ALJ also found that plaintiff's impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–20.

---

economy. *Id.*

[13] A claimant must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

The ALJ next found that plaintiff possessed an RFC for light work, *see* 20 C.F.R. § 404.1567(b), except that she was limited to standing and walking for four hours, could frequently balance, and only occasionally perform all postural activities. R. 20–27.

At step four, the ALJ found that plaintiff could not resume past relevant work. R. 27. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs in the national economy, such as cashier, ticket taker, folder, or, if more restricted in her RFC, as a telemarketer, addresser, or surveillance system monitor. R. 28–29. The ALJ, therefore, decided that plaintiff was not disabled from October 18, 2016, through June 30, 2021, and was ineligible for disability benefits. R. 29–30.

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*,

76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by using an improper standard or misapplying the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record lacks substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

### A.    *Substantial evidence supports the ALJ's assessment of plaintiff's residual functional capacity and her conclusion that plaintiff was not disabled.*

Plaintiff seeks a remand arguing that the limitations resulting from her physical and mental health problems prevent her from working. ECF No. 3, at 3. The undersigned construes this as an attack upon the ALJ's RFC findings and the ALJ's conclusion that plaintiff was not disabled during the pertinent time.

As part of the five-step sequential analysis, an ALJ must determine a claimant's RFC. *See* 20 C.F.R. § 404.1545. The RFC describes "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.*

20

The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). 20 C.F.R. § 404.1545(a)(5).

As noted above, ALJ Matula found that plaintiff possessed an RFC for light work, except that she was limited to standing and walking for four hours in an eight-hour workday, could frequently balance, and only occasionally perform all postural activities. R. 20. In reaching these conclusions, the ALJ reviewed the record and considered, among other things, plaintiff's testimony at both hearings, her disability and function reports, her treatment records with various providers, her daily activities, her background, her work history, the VE's testimony, and the opinions of state agency experts. R. 16–27.

Noting her lengthy history of working physically demanding jobs and her pride in doing hard work, plaintiff essentially argues that she would work if able and the ALJ erred in concluding otherwise. ECF No. 13, at 1. The ALJ's decision, however, did not question or assess plaintiff's work ethic. In fact, the ALJ reviewed plaintiff's prior on-the-job knee injury, the ensuing surgery, her worker's compensation claim, and her inability to return to her old line of work. R. 21–22. No disagreement exists, and the ALJ agreed that plaintiff could not return to the jobs which she once proudly held. R. 27 (noting also claimant's "significant functional limitations through the date last insured"); ECF No. 13, at 1.

Instead, the ALJ ruled that plaintiff could have performed other gainful employment during the pertinent period. Plaintiff rejects this conclusion, arguing generally that she cannot work due to physical and mental limitations, is overwhelmed, has lost her freedom and independence, and struggles to cope with anxiety, depression, panic attacks, pain, and associated stress that make it hard to get out of bed and engage in activities of daily life. ECF No. 13, at 1.

In accord with the law and applicable regulations, the ALJ considered plaintiff's statements, and reviewed her disability claim and found it wanting. Substantial evidence supports that decision. In assessing plaintiff's RFC, the ALJ discussed each of plaintiff's medical and mental impairments and stated why she found them, both singly and in combination, less than disabling. R. 16–27.

1.   *The ALJ's review of plaintiff's medical impairments.*

The ALJ considered that plaintiff's right knee injury dated back to 2011, was followed by surgery, physical therapy, and some injections for pain, and plaintiff was told she will one day need a knee replacement. R. 21–22. Despite plaintiff's reports of knee pain, however, the ALJ also observed that she no longer engaged in home exercise, R. 22, told her orthopedist she wanted no further treatment, R. 24, and had transitioned from useful, narcotic pain management for her back and knee to more conservative treatment with OTC medications, R. 24–25. *See also* R. 24 (noting condition of knee was "essentially unchanged" from 2017 to 2018). Based on the above, as well as treatment notes showing that plaintiff presented with a "normal gait," and pain management notes repeatedly documenting full range of movement in plaintiff's extremities, the ALJ found that plaintiff retained the ability to engage in limited standing and walking consistent with some kinds of full-time work. R. 23–25.

Similarly, the ALJ identified and relied upon evidence showing that plaintiff's back troubles were less than severe and reasonably well-managed. Although recognizing that treatment records sometimes showed mild to moderate pain with spinal movement, the ALJ gave greater weight to a September 2019 spinal MRI with normal findings, the conservative treatment recommendations from plaintiff's primary care provider, as well as plaintiff's positive response to pain management as discussed above. R. 24–25. In assessing that plaintiff had an RFC for a

22

reduced range of light work, the ALJ also relied upon records showing that plaintiff had "grossly intact neurological function" and the absence of extremity weakness or numbness. *Id.*

The ALJ also considered the impact of obesity upon plaintiff's physical and mental abilities. R. 25. Despite the absence of any noteworthy treatment, the ALJ recognized that plaintiff's obesity affected her ability to work, but concluded that the RFC selected adequately accounted for such effects. *Id.*

The ALJ also reviewed plaintiff's successful treatment for venous insufficiency and lymphedema. R. 24. Although plaintiff previously suffered from associated lower extremity swelling, pain, and skin changes, the ALJ found that plaintiff experienced marked improvement after ablation treatments in early 2019 that resolved her pain and substantially reduced her swelling. *Id.* Later, ultrasound testing also confirmed the absence of venous insufficiency and deep vein thrombosis. *Id.* Although the ALJ noted plaintiff's ongoing concern over reticular and spider veins and the presence of "some [continuing] hyperpigmentation of the ankles," she emphasized that examination found plaintiff to be "neurovascularly intact." *Id.* So, the ALJ concluded that, after 2019, no evidence existed "of significant problems with venous insufficiency or lymphedema" and no need existed for plaintiff to elevate her legs at work. *Id.*

Although having previously determined that plaintiff's other medical problems were also non-severe, the ALJ also considered them when assessing RFC. R. 23–24 (finding that "many of the claimant's impairments did not cause significant work-related limitations"). The ALJ found that medications relieved plaintiff's GERD symptoms and stabilized her hypertension. R. 16; *see* R. 24 (noting unremarkable workups for reported chest pain and palpitations and suspected tension-type headaches). The ALJ also discussed plaintiff's history of thyroid cancer (without reoccurrence) and found that her endocrinologist had effectively managed post-surgical

23

hypothyroidism with medication and testing, without major complications. R. 23. The ALJ also considered plaintiff's non-acute episode of gallstones in 2021, as well her possible hernia without complications at that time. R. 16.

###### 2. *The ALJ's review of plaintiff's mental impairments.*

The ALJ also carefully reviewed plaintiff's mental health impairments and found them to be non-severe. R. 17–19, 25–26. As directed by the Appeals Council in remanding the case after the prior ALJ's decision, ALJ Matula evaluated the severity of those impairments pursuant to the special technique regulation. R. 17–19; *see* 20 C.F.R. § 404.1520a; *see also Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659–62 (4th Cir. 2017) (discussing the "special-technique regulation"). The ALJ found that plaintiff had no limitations in understanding, remembering, and applying information and in adapting or managing herself. R. 17–18. And that plaintiff had only mild limitations in concentrating, persisting, or keeping pace and in interacting with others. *Id.*

ALJ Matula also explained the basis for these ratings relying upon, among other things: (a) plaintiff's normal insight and memory and the absence of any significant cognitive deficits; (b) plaintiff's ability to mostly handle her personal needs, medications, finances, drive, shop, and follow instructions at a basic level; (c) plaintiff's positive response to conservative treatment with medication for panic attacks, anxiety, mood, and depression; (d) plaintiff's "mental[] independen[ce]," in assorted activities of daily life; and (e) the absence of mental health treatment with a therapist or psychiatrist. *Id.*; *see* R. 25–26. Based on such evidence, the ALJ found that plaintiff could learn, remember, and use information at work, could regulate her behavior and emotions at work, and could, despite certain mild deficits, interact with bosses, co-workers, and the public, and focus upon and stay on task at work. R. 17–18.

24

The ALJ also supported these findings by noting plaintiff's specification of few mental limitations in her function reports, as well as her performance of life activities not fully consonant with her reported difficulties managing stress and changes in routine. R. 26. The ALJ also found Dr. Leizer's expert opinions to be persuasive. R. 18, 26. Dr. Leizer, a state psychological consultant, reviewed the treatment record and opined that plaintiff's mental impairments were not severe and caused no more than mild limitations in the broad areas of mental function. R. 18. Based upon this analysis, the ALJ concluded that plaintiff had no mental work-related limitations. R. 26.

The ALJ's RFC determination – that plaintiff could perform a limited range of light work with no more than four hours of standing and walking in an eight-hour day, with frequent balancing, and only occasional postural activities – is supported by substantial evidence.[14] Having reviewed the entire record, including plaintiff's statements about the effect of her impairments, the ALJ identified grounds for not fully crediting the latter and finding that plaintiff remained able to work at one or more of the jobs identified by VE Starosta. R. 23–28 (listing jobs of cashier, ticket taker, and folder).

Rather than stopping there, however, the ALJ gave plaintiff the benefit of the doubt and also explored the availability of work, by adding other physical and mental limitations beyond those noted in the RFC. R. 28–29. If limited to only sedentary work, VE Starosta testified that sizable numbers of jobs remained in the economy for one with claimant's background and limitations, including as a telemarketer, addresser (mail sort clerk), and surveillance system monitor. R. 28, 60–61.

---

[14] This evidence also includes the opinions of state agency medical consultants whose opinions the ALJ also found persuasive. R. 26–27.

Going further, VE Starosta testified that each of the six jobs noted above remained available, even with added nonexertional limitations for simple, routine work, performed at other than a fast pace in a non-production, non-assembly-line setting, and with no one else's work dependent upon the claimant's work. *Id.* Finally, at the ALJ's request, VE Starosta also excluded jobs requiring frequent public contact. R. 28–29, 61–62. Even with this added limitation, VE Starosta indicated that a sizable number of jobs remained for work as a folder, addresser, and surveillance system monitor (at reduced numbers). *Id.* (noting also that telephone telemarketing would not involve face-to-face public contact).

Having examined both the limitations flowing from the ALJ's RFC finding, as well as those potentially encompassed within plaintiff's more negative self-assessment, the ALJ found that substantial numbers of jobs existed in the economy that plaintiff could perform. That decision is well-supported by substantial evidence and in accord with applicable law and regulation.

## VI.   **RECOMMENDATION**

For all these reasons, this Court recommends that plaintiff's appeal of the Commissioner's final decision and request for a remand (ECF No. 13) be **DENIED**.

## VII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A

party may respond to any other party's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

      2.    A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

      The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

 

_____

Robert J. Krask

UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 22, 2024